AO 91 (Rev. 11/11)  Criminal Complaint (Rev. by USAO on 3/12/20)    ☐ Original   ☐ Duplicate Original

# UNITED STATES DISTRICT COURT

for the

Central District of California

**LODGED**
CLERK, U.S. DISTRICT COURT
05/23/2024
CENTRAL DISTRICT OF CALIFORNIA
BY: _____ DVE _____ DEPUTY

**FILED**
CLERK, U.S. DISTRICT COURT
5/23/2024
CENTRAL DISTRICT OF CALIFORNIA
BY: ___ M.M. ___ DEPUTY

United States of America

v.

ERIC WALTER GRAY,

Defendant

Case No. 8:24-mj-00228-DUTY

## CRIMINAL COMPLAINT BY TELEPHONE
## OR OTHER RELIABLE ELECTRONIC MEANS

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.

On or about the date(s) of May 8, 2024, in the county of Orange in the Central District of California, the defendant(s) violated:

| Code Section | Offense Description |
|---|---|
| 18 U.S.C. § 2113(a), (e) | Bank Robbery with Forced Accompaniment. |

This criminal complaint is based on these facts:

*Please see attached affidavit.*

☒ Continued on the attached sheet.

_____
/s/ Trevor Twitchell
*Complainant's signature*

_____
Trevor Twitchell, Special Agent, FBI
*Printed name and title*

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by telephone.

Date: _____May 23, 2024_____

_____
*Judge's signature*

City and state: _____Santa Ana, California_____

_____
Hon. John D. Early, U.S. Magistrate Judge
*Printed name and title*

AUSA:  Caitlin Campbell (ext. 3541)

## **AFFIDAVIT**

I, Trevor Twitchell, being duly sworn, declare and state as follows:

### I.   **INTRODUCTION**

1.   I am a Special Agent ("SA") with the Federal Bureau of Investigation ("FBI") and have been so employed since August 2014.  In that capacity, I am an "investigative or law enforcement officer of the United States" within the meaning of 18 U.S.C. § 2510(7) and am empowered by law to conduct investigations of and to make arrests for offenses enumerated in 18 U.S.C. § 2516.

2.   I received basic federal law enforcement training at the FBI Academy in Quantico, Virginia from August 2014 through December 2014.  This training included segments on conducting criminal investigations, interviews, narcotics identification, gangs, and other law enforcement topics.  From 2014 through 2020 I was assigned to white-collar squads in the Los Angeles Field office where I investigated complex financial crimes.

3.   Since 2020, I have been assigned to the Violent Crimes and Major Offenders squad in the Orange County Resident Agency of the Los Angeles Field Office.  In this capacity I worked from 2020 to 2023 on the Orange County Violent Gang Task Force and was responsible for coordinating Federal Agents and Task Force Officers in order to effectuate complex enterprise investigations.  As part of the violent crime squad, I have conducted investigations into violent gangs, kidnappings, crimes against children, violent threats, bank robberies, and

fugitives.  As an FBI SA I have participated in numerous search and arrest warrants associated with individuals who were involved in violent criminal acts.

4.   I am currently the Bank Robbery investigator and coordinator for Orange County, California.  In that capacity I investigate bank robbery cases assigned to me and review, analyze, and disseminate investigative data (including bank surveillance photographs and video) on nearly all bank robberies, and attempted bank robberies, that occur in Orange County.

5.   In connection with the investigations in which I have participated, I have used a variety of investigative techniques, including witness interviews, reviewing surveillance images, cellular telephone exploitation, and reviewing physical evidence.  Through formal training, experience, and my conversations with other law enforcement personnel, I am familiar with the methods and techniques used by individuals to commit crimes as well as the methods used to cover up their criminal activities.

## II. <u>PURPOSE OF AFFIDAVIT</u>

6.   This affidavit is made in support of a criminal complaint against, and arrest warrant for, Eric Walter GRAY ("GRAY") for a violation of 18 U.S.C. §§ 2113(a), (e) (Bank Robbery with Forced Accompaniment).  The facts set forth in this affidavit are based upon my personal observations, my training and experience, and information obtained from various law enforcement personnel, reports, and witnesses.  This affidavit

is intended to show merely that there is sufficient probable cause for the requested complaint and warrant and does not purport to set forth all of my knowledge of or investigation into this matter.  Unless specifically indicated otherwise, all conversations and statements described in this affidavit are related in substance and in part only, and all dates and times are on or about those indicated.

### III. <u>SUMMARY OF PROBABLE CAUSE</u>

7.   On May 8, 2024 at approximately 4:40 p.m., a call was placed to Anaheim Police Department reporting a bank robbery in progress.  Witnesses and victims reported that a man entered the bank and loitered for a long time.  The subject, later identified as Eric Walter GRAY ("GRAY"), told a bank employee that he was waiting in the bank for a ride to pick him up.

8.   After returning from using the bank's bathroom, GRAY jumped over the teller counter, stated that he had a gun, and demanded money from the teller.  Money was taken from the teller drawers and given to GRAY, who proceeded to put the money in his pockets.

9.   After taking the money, GRAY then directed the bank manager and two other employees into a storage room.  GRAY eventually let two employees out of the room but would not allow the bank manager to leave.  The bank manager was held against his/her will for approximately one hour.  Eventually, GRAY exited the bank with the bank manager and was taken into custody by the Anaheim Police Department.

10.   While in custody at the Anaheim Police Department, GRAY was found to have hidden cash and narcotics within his rectal cavity.  The items were removed at the Anaheim Police Department, but investigators suspected that GRAY still had additional items hidden within his body cavities.  For GRAY's safety and the safety of the officers, GRAY was taken to the hospital for a CT scan.  While at the hospital, GRAY repeatedly attempted to escape and fought with officers, resulting in multiple injuries to the officers involved.

11.   In a Mirandized interview that occurred at the Anaheim Police Department after the robbery, GRAY admitted to, among other things, jumping the bank counter, taking cash from the teller drawers, telling bank employees he had a gun, and holding the employees against their will.

12.   Of note, GRAY has a lengthy criminal history that includes, but is not limited to, grand theft auto, robbery, sexual battery, and narcotics-related offenses.  GRAY was released from San Quentin prison on May 7, 2024 (the day before the robbery described herein).

## IV. <u>STATEMENT OF PROBABLE CAUSE</u>

13.   Based upon my review of email messages, law enforcement reports, discussions with other law enforcement personnel, database checks, and interview reports, as well as my involvement in the investigation and discussions with other federal and local law enforcement also involved in this investigation, I am aware of the following:

**A.    May 8, 2024 Bank Robbery**

14.    In the afternoon of Wednesday May 8, 2024, at approximately 3:15 p.m., a subject, later identified as GRAY, entered the BMO Bank Branch located at 5401 East La Palma Avenue, Anaheim, California 92807.  This bank branch is insured by the Federal Deposit Insurance Corporation.  GRAY initially asked bank teller H.M. about getting money from a prepaid gift card.  H.M. told GRAY that he/she could not help GRAY because he was not a customer of the bank and the card did not have his name on it.  GRAY then asked if he could use the bathroom and H.M. provided GRAY with the bathroom code.  GRAY left to use the restroom but returned a short time later to tell H.M. that the bathroom code had not worked.  H.M. told GRAY he/she could not help him.

15.    GRAY loitered in and around the branch for approximately one hour.  While loitering, GRAY was contacted by bank manager B.J.P. who asked GRAY if he needed anything.  GRAY stated that he was waiting for his Lyft and that he preferred to wait in the air-conditioned bank.

16.    Bank teller M.Z. was alone on the bank floor when GRAY approached the teller counter, jumped over to the teller side and said "Robbery."  GRAY then said, "Everybody be cool; give me the money."  M.Z. complied with GRAY's request, opened the teller drawer and handed GRAY money from inside her drawer. GRAY directed M.Z. to open the other drawers but M.Z. stated that he/she did not have the keys to those drawers.  M.Z. believed there was less than $1,000 in the drawer at the time.

17.   At approximately 4:10 p.m., H.M. went on break in the employee break room.  While in the break room, H.M. could see on the surveillance monitor that GRAY was on the employee side of the teller counter.  H.M. exited the break room to investigate.  As soon as H.M. was out of the break room, GRAY told H.M. to open her teller cash drawer.  H.M. opened the drawer and saw GRAY grab approximately $1,000 in cash and stuff it into his pockets.

18.   At that point, bank manager B.J.P. received a message via the Microsoft Teams app from a teller that said, "I need help, robbery."   B.J.P. exited his/her office and noticed that GRAY was on the teller side of the counter.  B.J.P. did not see how GRAY got to the other side of the counter.  B.J.P. told GRAY that GRAY needed to be on the other side of the counter.  GRAY responded, "I'm right where I need to be."  B.J.P told GRAY to get the money and go.  GRAY responded, "No, no, no, you need to come over here."  B.J.P. walked over to the other side of the counter where GRAY and the tellers were.  GRAY pulled B.J.P. and teller H.M. close to him while he watched everyone else in the branch.

19.   Around this time, bank teller M.Z. heard GRAY say "I don't want to have to shoot anybody" while he patted his waist with his right hand.  M.Z. did not see a weapon but mentioned that GRAY was wearing baggy clothes.

**B.   GRAY Ordered Employees into the Bank Storage Room**

20.   GRAY ordered bank manager B.J.P and bank tellers H.M. and M.Z. into a nearby storage room.  The three of them stood in

the interior space of the storage room while GRAY stood in the
storage room doorway.  GRAY told B.J.P. to leave the storage
room and call a cab for GRAY, which B.J.P. did, utilizing one of
the bank landlines.  After the call, B.J.P. was directed, by
GRAY, back into the storage room.  Shortly after, since there
were still customers in the bank, GRAY instructed bank teller
M.Z. to tend to the new customers that had just walked in.  GRAY
then re-entered the storage room with bank manager B.J.P and
bank teller H.M.  B.J.P. stated that GRAY "grabbed" his/her
shirt a few times while directing B.J.P. where to go.

21.  GRAY asked if B.J.P. and H.M. had their phones.  H.M.
had his/her phone but told GRAY that he/she did not have a
phone.  B.J.P. did not have his/her phone.  GRAY stated that he
wanted to them to call 911.  B.J.P. tried to call on his/her
Apple watch, but there was no service.  H.M. told GRAY that if
he wanted them to call 911 he would need to let them go.  At
that point, GRAY sat down in front of the storage room door to
block it and to keep B.J.P. and H.M. from leaving.  GRAY also
moved items inside the storage room in an attempt to barricade
the door.  GRAY then ordered B.J.P. to sit next to him.

22.  At one point, H.M. was able to open the door to the
storage room slightly and get out.  H.M. believed B.J.P. may
have helped get the door open.  Once outside of the storage
room, H.M. called 911 from the parking lot, told 911 a robbery
was in progress, and waited for the police.

23.  While still in the storage room, GRAY told B.J.P. that
he had a gun with six bullets.  B.J.P. did not actually see a

gun.  GRAY kept trying to show B.J.P. the gun by pulling at his waistband and pocket, but B.J.P. did not want to see the gun and did not look.  GRAY repeatedly told B.J.P., "Oh, shit! I made a mistake."  B.J.P. estimated that the two of them were in the storage room for about an hour.  During this time, B.J.P. was allowed to move freely within the confines of the storage room but was not allowed to exit the storage room.  GRAY and B.J.P. would alternate between sitting and standing.  When GRAY stood, B.J.P told him, "Hey, let's leave, let's leave."  When B.J.P. told GRAY this, GRAY blocked the door with his body, preventing B.J.P. from exiting.  GRAY also repeatedly told B.J.P., "I have a gun.  I don't want them to do anything stupid."

24.  Eventually, after B.J.P. said to GRAY, "Okay, let's finally go," GRAY responded, "Okay, let's go together."  GRAY had given B.J.P. the money he had stolen from the teller drawers earlier while in the storage room and made sure B.J.P. had the money in B.J.P.'s hands before they left the storage room together.  Once they left the storage room, GRAY was taken into custody.  Additional money was found in GRAY's pockets when he was searched after being taken into custody.  The amount of cash initially received from both GRAY and B.J.P. was $1,431.

C.  **Victim Interviews**

25.  When asked how he/she felt when GRAY ordered him/her into the closet, bank teller H.M. stated that he/she was afraid that GRAY was going to hurt him/her and that he/she felt he/she was in greater danger once inside the storage room.  H.M. also stated he/she felt like crying and running away immediately, but

did not because it could have jeopardized the lives of B.J.P. and M.Z.  Additionally, H.M. said he/she was trained to comply with a robber's demands and not to agitate them.  H.M. did not go into the storage room voluntarily and felt forced into the storage room because GRAY had previously mentioned a gun, although H.M. did not actually see a weapon.

26.  When asked how he/she felt during the incident, teller M.Z. stated that he/she was scared and felt like GRAY would harm him/her if he/she didn't do what he said.  After GRAY took the money, he told the employees to move away from the phone, "I don't want to have to shoot anybody" while he patted his waist with his right hand.  M.Z. did not feel like he/she was free to leave the storage room and became visibly emotional while recounting the experience during an interview with law enforcement.

27.  When asked how he/she felt during the incident, bank manager B.J.P. stated that he/she was scared, even though B.J.P. was pretty sure GRAY did not have a gun.  B.J.P. observed H.M. start to panic while they were in the storage room.  I could also see B.J.P. visibly shaking during the course of his/her interview with law enforcement.

**D.  GRAY Admitted to the Robbery**

28.  Detective Staci Dietz interviewed GRAY at the Anaheim Police Department the evening of the incident.  GRAY was Mirandized, indicated he understood his rights, and stated that he would talk with the detective.

29.   GRAY explained how he had been released from San Quentin state penitentiary on May 7, 2024, the day before the robbery.  He described how he rode the bus to the parole office in Anaheim, where he was supposed to be housed, but the house was "shut down."  GRAY decided he would stay the night near the parole office where he met "some guys" that provided GRAY with "crystal meth."  GRAY said he smoked the narcotics and got high. The narcotics made GRAY extremely anxious and paranoid.  At approximately 12:30 a.m., due to the anxiety and paranoia he was feeling, GRAY called 911 and was transported by ambulance to Kaiser Hospital at 3440 East La Palma Avenue in Anaheim.  GRAY was at Kaiser until they "kicked him out" at about 10:30 a.m.

30.   GRAY took a bus from the hospital and ended up getting off near the BMO Bank branch.  GRAY had a $200 debit card given to him by parole and went into the bank to see if he could get the money from the card.  The bank teller told GRAY he/she could not help him because the card did not have his name and GRAY did not have any identification.

31.   At that point, GRAY used the bank's bathroom.  While in the bathroom, GRAY "did some more" narcotics to get high. GRAY went back into the bank and noticed that the bank did not have any security guards.  GRAY then said he, "out of nowhere," jumped over the teller counter.  GRAY then recounted the events that have been described by the witnesses previously.

32.   Specifically, GRAY explained that, during the robbery, GRAY told employees, "Just relax, I ain't gonna hurt you.  Just give me all the money."  GRAY stated that he did not physically

grab any of the victims and that he "told" them where to go. When asked why victim B.J.P. would say that GRAY had a gun, GRAY responded by saying that he mentioned the gun when he got the money out of the drawer.  GRAY also said he noticed two Hispanic customers that "did not appreciate" what GRAY was doing. According to GRAY, GRAY told them, "Motherfucker, try something, I got something for you."  GRAY also confirmed that he had told B.J.P. that GRAY had a gun, but that he had not tried to show it to B.J.P.  At one point, GRAY said he thought he heard somebody try the door handle to the storage room, at which point GRAY said, "I'm tellin you they making me play, I'm gonna fuck around and bust on somebody."  GRAY said that he made that statement "just for affect" to keep people out of the storage room.

33.  GRAY also stated that, at one point, while victim B.J.P. was speaking to the police from inside the storage room, GRAY (who did not believe it was the real police) said to B.J.P., "You let them know I got a pistol but I'ma leave it in here."  GRAY confirmed that he had let the tellers out of the storage room, but that he did not allow bank manager B.J.P. to leave because B.J.P. had all the keys.

34.  When asked how GRAY thought the victims felt during the incident, GRAY said they felt like "their life was in danger, they felt afraid, and they felt vulnerable" even though GRAY said he was nice to them and that they did not fear for their lives.  GRAY wrote an apology letter to the people of the bank which was booked into evidence.  The letter said "To those

at BMO bank, I'm sending you my deepest apology.  What I put you through."

**E.    GRAY Hid Money and Narcotics in His Rectum**

35.    After the interview concluded, Detective Dietz was informed that approximately $240 of the money that had been taken from the bank was still missing.  GRAY had served multiple prison sentences and had recently been released from San Quentin.  Detective Dietz knew that prisoners sometimes hid items in their rectal cavity and suspected that GRAY could have hidden the cash within his rectum to smuggle it into jail or prison.

36.    A strip search was performed, which revealed $120 and suspected methamphetamine hidden within GRAY's rectum.  Officers suspected that there were more items hidden in GRAY's rectum. However, GRAY refused to allow another search.  As a result, GRAY was transported to Orange County Global Hospital where, for officer safety and GRAY's safety, a CT scan was ordered to verify whether or not there were additional items hidden within GRAY's body cavities.

**F.    GRAY Repeatedly Tried to Escape From the Hospital, Injuring Officers**

37.    Once at the hospital, GRAY was handcuffed with one arm to the gurney and his legs shackled together.  GRAY continuously requested that he be unhandcuffed and kept trying to adjust his body to the edge of the gurney.  GRAY also made continuous requests to use the restroom.  Out of fear that GRAY would flush the evidence/contraband, and for a fear of officer safety, GRAY

remained handcuffed but was afforded accommodations that would have allowed him to use the restroom.  Despite GRAY's repeated requests to use the restroom, GRAY did not urinate or defecate.

38.  This caused officers to suspect that GRAY was plotting something and using the need to use a restroom as a ruse. Officers Yoo and Juntilla attempted to handcuff GRAY's other hand at which point GRAY began to fight with officers.  Officers were able to get a second set of handcuffs on GRAY, but GRAY was able to free himself from the officer's grasp, leaving a dangerous unsecured handcuff attached to GRAY's hand.  This presented a serious officer safety risk, given the sharp edges of the handcuff that were exposed and the ability for GRAY to swing it at officers.  Both Officers Yoo and Juntilla sustained injuries during the fight as a result of coming into contact with the exposed handcuff.  The only thing that stopped the fight was an open palm strike to GRAY's face, which allowed the officers to handcuff both of GRAY's hands to the gurney.

39.  Officers took GRAY to the CT scan room three times. Each time GRAY would refuse to let them do the CT scan.  At one point, GRAY stood up and ran to the door, only to be stopped by Sargent JJ Smith, who also sustained an injury in the process of preventing GRAY from escaping.

40.  After the third attempt, the decision was made to sedate GRAY to allow the hospital to complete its CT scan, which was deemed necessary for GRAY's safety and the safety of others. Ultimately, no additional items were found.

## V.  <u>CONCLUSION</u>

41.  For all the reasons described above, there is probable cause to believe that ERIC WALTER GRAY violated 18 U.S.C. §§ 2113(a), (e) (Bank Robbery with Forced Accompaniment).


/s/ Trevor Twitchell
_____
Trevor Twitchell, Special Agent
Federal Bureau of Investigation



Subscribed to and sworn before
me this __23__ day of May, 2024.

_____
HONORABLE JOHN D. EARLY
UNITED STATES MAGISTRATE JUDGE